# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | |
|---|---|
| In re: | |
| GORDON PROPERTIES, LLC, | Case No.   09-18086-RGM |
| | (Chapter 11) |
| Debtor. | |
| GORDON PROPERTIES, LLC, | |
| Plaintiff, | |
| vs. | Adv. Proc. No. 11-1020 |
| FIRST OWNERS ASSOCIATION OF FORTY SIX HUNDRED, | |
| Defendant. | |

## <u>MEMORANDUM OPINION</u>

The enforcement of provisions in a condominium's bylaws that prohibit a chapter 11 debtor with a pre-petition delinquency in the payment of condominium fees from voting at an annual meeting or holding office as a director of the condominium association violates the automatic stay.[1] First Owners Association of Forty Six Hundred enforced such a provision by cancelling its 2010

---

[1] Article IV, Section 7 of the By-Laws provides:

        Section 7.  Voting.  At every meeting of the members, each member present, in person or by proxy, shall have the right to cast the vote assigned to his Unit .  .  . on each question for each membership which he owns. .  . . No member shall be eligible to vote, either in person or by proxy, or to be elected to the Board of Directors who is shown on the books or management account of the Owners' Association to be more than thirty (30) days delinquent in any payment due the Owners' Association.

Article V, Section 7 of the By-Laws provides:

        Section 7.  Removal of Directors.  .  .  . The term of any Director who becomes more than thirty (30) days delinquent in payment of any Assessments and/or carrying charges due the Owners' Association shall be automatically terminated and the remaining Directors shall appoint his successor.

1

annual meeting. The association will be sanctioned $100,000 if it does not purge itself of its contempt by holding its 2011 annual meeting on October 5, 2011, and allowing the debtor to both vote at it and hold office as a director of the association, if elected.

## I.  Factual Background

### A.  The Condominium and the Pre-Petition Debt

Forty Six Hundred Condominium consists of a high-rise apartment building which contains more than 400 residential and commercial units and two separate structures adjacent to the high-rise building, a gas station and a restaurant, each of which is a condominium unit. The debtor owns the restaurant unit and 40 commercial and residential units in the high-rise building. Several years ago the Board of Directors decided that it had used the wrong method – for apparently almost 30 years – to apportion the common expenses among all of the condominium units. The old method allocated insufficient common expenses to the restaurant resulting in underassessing it, and, concomitantly, overassessing all of the other units. The Board of Directors sought to correct the mistake. It recalculated the restaurant unit's condominium fees for the then-current and preceding five years, which were all of the condominium assessments not barred by the statute of limitations. The addition to the preceding five years' condominium fees was $279,984.33. The current year assessment was $61,512. With additions for interest and late charges and subtractions for payments, the association claimed $315,673.36 on its proof of claim for the restaurant unit. The debtor is current on all post-petition condominium fees assessed against the restaurant unit and on all pre- and post-petition condominium fees assessed against its other 40 condominium units.

## B.  Relations Between the Debtor and the Association

There is a long history between the debtor, its predecessors in interest and the condominium. The declaration and bylaws of the condominium were recorded on November 16, 1975. Condominium Services, Inc., which is also called CSI, was organized in 1979 by the grandfather of the four members of the debtor.  The debtor is a limited liability company organized about 2005 to receive the condominium units it now owns from a trust established by the debtor's members' grandfather for their benefit.  About the same time that the condominium units were transferred from the trust to the debtor, CSI – also a trust asset – became a wholly owned subsidiary of the debtor.

CSI was the managing agent for the condominium association from apparently 1979 until August 1, 2006 and currently manages, among other properties, all of the debtor's 40 condominium units and the restaurant unit.   In August 2005, the association entered into a management agreement with CSI for a term of about two years, from November 1, 2005 to October 5, 2007.  On July 1, 2006, the association's board of directors terminated CSI as managing agent for cause effective August 1, 2006.  Litigation ensued, first between the debtor and the association, and later, between CSI and the association.   Ultimately, the association obtained a judgment against CSI for compensatory damages of $91,125 and punitive damages of $275,000.  The matter was appealed to the Supreme Court of Virginia which affirmed the judgment.  *Condominium Services, Inc. v. First Owners' Association of Forty Six Hundred Condominium, Inc.*, 281 Va. 561, 709 S.E. 2d 163 (2011).

After terminating CSI, the board determined that it had improperly calculated the condominium assessment for the restaurant.  Litigation ensued with the debtor.  The state court found in favor of the association which then issued a new corrected assessment.  The debtor filed

its chapter 11 petition in this court on October 2, 2009.  The association filed a proof of claim for the past-due condominium fees for the restaurant unit only.  All of the other units owned by the debtor were and remain current.  The debtor is current in the payment of its post-petition assessments on the restaurant unit.  CSI filed its petition in this court on January 26, 2010.  The parties have been litigating matters on appeal for most of the time since the filing of the petitions.

In October 2006, the association held its annual meeting.  This was the last time directors were elected to the board of directors.  The board consists of seven members, each of whom serves a two-year term.  Bylaws Article V, Section 5.  The terms are staggered so that four directors are elected in one year and three in the alternate year.  Directors continue in office until their successors are elected and hold their first meeting.  There has been no annual meeting since 2006.  The vacancies on the board of directors have been filled by the holdover directors exercising their power to appoint successor directors to fill vacancies.  Bylaws Article V, Section 6.

The 2007 annual meeting was not held because of a lack of a quorum.  The 2008 annual meeting was called, but, the board of directors cancelled the meeting by posting a note on the door of the meeting room shortly before the meeting was to be convened asserting that because of the number of delinquent unit owners, a quorum would not be obtained.  The 2009 annual meeting was called.  A quorum was almost obtained but rather than recessing the meeting and seeking more proxies and attendees, the meeting was adjourned sine die over the debtor's opposition even though it held the most votes at the meeting and the majority of the unit owners present voted against adjourning sine die.  *Gordon Properties, LLC vs. First Owners' Association of Forty Six Hundred Condominium, Inc. (In re Gordon Properties, LLC),* 435 B.R. 326 (Bank.E.D.Va. 2010) *aff'd* 2011

WL 2159715 (4th Cir. 2011).  The 2010 meeting, although duly called for October 6, 2010, and

noticed to the unit owners, was cancelled on September 28, 2010.


### C.  The Cancellation of the 2010 Annual Meeting

The board properly called the 2010 annual meeting in August or September 2010 for

October 6, 2010, and sent notice and the annual meeting package to all unit owners.  Just before

September 21, 2010, a flyer was distributed to the unit owners of the condominium.  It contained a

picture of a flat-screen high-definition television with the word "Free!" on it and a picture of a

campaign button that said only, "VOTE", bordered with stars.  The flyer stated: "Voting alert to all

owners!  VOTE VOTE VOTE";  "Vote for a chance to win a flat-screen HDTV home theater";

"ALL owners are eligible.  Outside owners, delinquent owners, and resident owners!"  It also stated:

> In order to encourage participation in the FOA Annual Meeting on Wednesday,
> October 6, a flat-screen HDTV will be awarded after the close of the meeting to a
> unit owner selected at random from among all unit owners who register their votes
> for quorum purposes at the meeting.

> Mail proxies to: P.O. Box 23193, Alexandria, VA 22304.

Ex. 8.

The idea originated from a unit owner. She took the idea and a draft flyer to the debtor for

assistance.  The debtor offered to assist in the purchase of the HDTV up to $800, edited the flyer and

assisted in distributing it.

The flyer immediately came to the attention of the property manager who was also

responsible for organizing the annual meeting and to the attention of individual members of the

board of directors.  The association's property manager immediately called his counterpart at CSI.

5

They discussed the matter.  The association's property manager reasonably concluded that the debtor was involved.

The property manager then called the association's counsel.  Counsel represented the association generally and also in the law suits and appeals with the debtor and CSI.[2]  The property manager was concerned about the impact of the flyer on the annual meeting.  He had three concerns: The flyer referred to delinquent owners;[3] the address to which proxies could be mailed did not contain a name; and the flyer was not signed.

A meeting of the board of directors was previously scheduled for September 21, 2010. Counsel were scheduled to attend.  The board had scheduled the 2010 annual meeting and mailed the notices of the meeting and proxies as required by the bylaws, but scheduled the meeting with its attorneys because it remained uncertain how to proceed with regard to allowing the debtor to vote at the annual meeting.  Specifically, it did not know what to do about enforcement of the bylaws voting provision as to the debtor.  Should it follow this court's Memorandum Opinion of June 2, 2010, and let the debtor vote or should it enforce its bylaws voting provision and not allow the debtor to vote?

The issue of whether the enforcement of the bylaws voting provision violated the automatic stay was previously litigated in this court.  *Gordon Properties, LLC vs. First Owners' Association of Forty Six Hundred Condominium, Inc.*  In that case, the debtor sought to hold the association in contempt because, it asserted, the association had violated the automatic stay by its conduct during

---

[2]New counsel was retained by the association to defend it in this adversary proceeding.

[3]The bylaws voting provision only prohibits delinquent unit owners from voting. It does not prohibit them from attending the annual meeting, participating in the annual meeting (except voting) or being counted for quorum purposes.

6

the 2009 annual meeting.  The facts of that case are more fully set out in the Memorandum Opinion

and need not be repeated here.  The issue came down to the vote by the members present – who did

not constitute a quorum – to adjourn the meeting sine die rather than adjourn it for a short period in

order to attempt to obtain a quorum.  The vote to adjourn sine die was, in fact, defeated but the chair

announced that it had passed.  She then adjourned the meeting so quickly that no one had time to

appeal the decision of the chair to the members present.  The court was faced with two questions:

Would enforcement of the bylaws voting provision violate the automatic stay and did the actions at

the meeting constitute enforcement of the bylaws provision.  Both questions had to be answered

affirmatively for the debtor to prevail.  This court determined that enforcement of the bylaws voting

provision was a violation of the automatic stay.  The remaining question was whether the debtor had

been denied its right to vote because of its pre-petition delinquency.  The debtor's position was that

while it was ostensibly allowed to vote on the motion to adjourn, its vote was ignored in determining

the outcome.  Thus, the bylaws voting provision was enforced and the automatic stay was violated.

The debtor's legal argument was well taken.  If the debtor was ostensibly permitted to vote, but its

vote was ignored or not counted, it was the same as if it were denied its right to vote.  It is the

substance that counts, not the appearance.  The court found, as a matter of fact, that the debtor voted,

but that the chair's erroneous ruling on the motion to adjourn sine die was not an enforcement of the

bylaws voting provision although her conduct was abusive.  The complaint was dismissed.

Notwithstanding that it won, the association appealed.  The District Court found that the

association was the prevailing party and held, therefore,  that it did not have standing to appeal.  *First*

*Owners' Association of Forty Six Hundred Condominium, Inc. v. Gordon Properties, LLC (In re*

*Gordon Properties, LLC),* E.D.Va. Civil Action No. 10-872, Order dated August 27, 2010.  The

District Court clearly noted that this court's discussion of the bylaws voting provision did not

collaterally estop the association from litigating the same issue in any future litigation because it was

not necessary to the resolution of the case. *Electrical Fittings Corp. v. Thomas & Betts Co.,* 307

U.S. 241, 242, 59 S.Ct. 860 (1939) ("A party may not appeal from a judgment or decree in his favor,

for the purpose of obtaining a review of findings he deems erroneous which are not necessary to

support the decree."). The only necessary finding was that the association had not denied the debtor

its right to vote. The order simply denied the debtor's motion for a preliminary injunction. The

association appealed to the Court of Appeals which affirmed the District Court in a per curiam

decision on June 2, 2011, also finding that the association as the prevailing party had no standing to

appeal. *First Owners' Association of Forty Six Hundred Condominium, Inc. v. Gordon Properties,*

*LLC (In re Gordon Properties, LLC),* 2011 WL 2159715 (4th Cir. 2011).

The board met with its attorneys on September 21, 2010, after the District Court's decision

but before the Court of Appeal's decision. The issue of the flyer was added to the board's agenda.

Counsel orally opined that the flyer constituted an unlawful raffle and that solicitation of proxies for

an undisclosed principal was improper. Thus, he orally opined, any proxy obtained through the flyer

was invalid. Since it would not be possible to determine which proxies were obtained through the

flyer, all proxies were tainted and the meeting should be postponed and new proxies issued.

Counsel also orally opined that the board was on the horns of a dilemma with respect to

allowing the debtor to vote at the upcoming annual meeting. He premised this on the idea that there

was no definitive judicial decision as to whether enforcement of the bylaw voting provision violated

the automatic stay. If the board allowed the debtor to vote and the enforcement of the bylaws voting

provision did not violate the automatic stay, then the board would violate the bylaws in allowing the

8

debtor to vote and the election of the members of the board of directors could be tainted.  On the

other hand, if the board denied the debtor the right to vote and the enforcement of the bylaws voting

provision did violate the automatic stay, it would be in contempt of court and the election of the

members of the board of directors could be tainted.  The board requested a written opinion and

adjourned to September 28, 2010 to further consider the matter.

On September 24, 2010, the board of directors, over the signature of the president, posted

a letter to all unit owners, titled in bold large type: "IMPROPER CAMPAIGN ACTIVITY" and

"URGENT NOTICE TO OWNERS".  It warned the unit owners not to send in proxies as requested

in the flyer.  The first paragraph states:

> I regret to inform you that some owners of FOA 4600 Duke Street may have become
> unwitting victims of improper and perhaps illegal activity related to the upcoming
> election.  Because of the possible legal consequences to those who sponsor or
> participate in such activities, all owners need to be aware of this situation.

Ex. 9.

On September 28, 2010, the board received the requested written opinion.  Although signed

only by the law firm, it was prepared by counsel.  It is three and a half pages in length.  The first page

sets out the two questions presented and the summary response.  With respect to the flyer, Counsel

stated in his summary response:

> [W]e believe that the solicitation is improper and may violate state and local laws.
> Any proxies obtained via the solicitation are invalid.  Accordingly, the Board should
> postpone the meeting to reissue new proxy forms to ensure the validity of all proxies
> to be used at the Annual Meeting.

Ex. 10 at 1.

With respect to the enforcement of the bylaws voting provision, counsel's summary response

stated that without a final decision on the enforceability of bylaws voting provision,

9

the Board is placed in the untenable position of potentially violating the stay, and subjecting the Association to sanctions and other penalties if [the debtor] is not allowed to vote, or allowing [the debtor] to vote in violation of the Bylaws and the Condominium Act and potentially having to throw out the results of any election if the appellate court subsequently agrees that enforcement of the Bylaws as to [the debtor] does not violate the automatic stay.   Notwithstanding the Association's efforts to obtain a binding court decision on this issue, the conflict between the apparent holding by Judge Mayer in the Bankruptcy Court and the clear provisions of the Association's Bylaws poses an insoluble dilemma for the Board and the Association which almost forces the Association to choose among alternatives which are all fraught with risk.  Avoiding the dilemma by postponing the meeting also poses a risk that a unit own may challenge the postponement itself, but we believe that this alternative poses the least risk to the Association.

Ex. 10 at 1 - 2.

The discussion portion of the written opinion is two pages in length, broken into seven paragraphs.  The first three paragraphs, about half of the discussion portion by length, accurately recite the provisions of the bylaws, the pre-petition delinquency as to the restaurant unit and the course of the prior litigation.  It accurately states that the District Court found that this court's discussion of the applicability of the automatic stay to be, as counsel quoted from the District Court's opinion, "wholly collateral" and, in counsel's words, "therefore not binding or appealable."  *Id.* at 2.  He also accurately stated that "the Fourth Circuit will not rule on the appeal until some time after the date scheduled for the 2010 Annual Meeting."  *Id.*

There is a brief paragraph concerning the flyer and finally, a discussion of the risks of postponing the annual meeting.  The final recommendation was to postpone the annual meeting "until such time as a final decision is obtained on the issue" of the bylaws voting provision.  "[P]ostponing the meeting until [the bylaws voting provision] issue is finally resolved avoids the possibility of an improper election of a Board as a result of [the debtor] being allowed to vote."  *Id.*

The board voted to postpone the 2010 annual meeting.  New proxy forms were never prepared or distributed. The meeting was never rescheduled.  After the Court of Appeals issued its opinion, the debtor requested a special meeting.  The request, although valid on its face, was denied. The holdover directors elected in 2005 and 2006 and those they appointed to fill vacancies on the board remain in office today.

## II. Discussion

### A.  Legal Standard for Stay Violation

A violation of the automatic stay occurs when a creditor takes one of the acts proscribed by §362(a).  It is the act that is the violation of the automatic stay, not the creditor's knowledge that the act violates the automatic stay.  A creditor's state of mind or even knowledge of the pendency of a bankruptcy is not relevant to whether §362(a) has been violated.  The automatic stay comes into effect immediately upon the filing of a petition, even if the creditor is unaware of the filing.

There is a difference between whether the automatic stay has been violated and whether a creditor will be sanctioned for violating the automatic stay.  Although a violation occurs when a proscribed act is taken, a creditor will not be sanctioned if the violation is not willful.  Bankruptcy Code §362(k)(1).  The Court of Appeals for the Fourth Circuit discussed the elements of willfulness. It stated:

> To constitute a willful act, the creditor need not act with specific intent but must only commit an intentional act with knowledge of the automatic stay.  *See Budget Service,* 804 F.2d at 292-93; *In re Alt. Business & Community Corp.,* 901 F.2d 325, 329 (3rd Cir.1990).

11

*Citizens Bank of Maryland v. Strumpf (In re Strumpf),* 37 F.3d 155, 159 (4th Cir.1994) *rev'd on other*

*grounds,* 516 U.S. 16, 116 S.Ct. 286 (1995).  The Court of Appeals for the Fifth Circuit succinctly

set out the three elements necessary to sanction a creditor under §362(k)(1) [then §362(h)].  It stated:

> [T]here are three elements to a claim under 362(h): (1) the defendant must have
> known of the existence of the stay; (2) the defendant's acts must have been
> intentional; and (3) these acts must have violated the stay.

*Brown v. Chesnut (In re Chesnut),* 422 F.3d 298, 302 (5th Cir. 2005).  The court will utilize the three-

pronged *Chesnut* formulation in this case.


## B.  Application of Legal Standard

### First Prong: Knowledge of Existence of the Stay.

The association knew of the filing of the petition almost immediately after it was filed on

October 2, 2009.  The same day that the petition was filed, the debtor filed a complaint against the

association, a motion for a preliminary injunction and a motion for an expedited hearing on a motion

for a preliminary injunction.  The association filed its opposition to the motion for a preliminary

injunction on October 6, 2009.  The action complained of occurred on September 28, 2010, almost

a year later.

### Second Prong:  Intention.

The association's act of cancelling the 2010 annual meeting was intentional.  It sought the

advice of counsel as to its rights and obligations.  Counsel advised the board of directors that the

association could be held in contempt of this court if it denied the debtor its right to vote at the 2010

annual meeting and, while he opined that postponing the annual meeting was the least risky course

to take, he cautioned the board that even postponing the meeting which is required by the

association's bylaws could result in adverse action against it.  The board of directors after having

been advised by its counsel, cancelled the 2010 annual meeting.  The act of cancelling the meeting

was an intentional act.

### Third Prong: The Acts Must Have Violated the Stay.

The third prong presents two issues.  The first is a question of law: Does the enforcement of

the provision of the bylaws voting provision violate §362(a)(6) as an act to collect a debt?  The

second is a question of fact: Did the board of directors, acting on behalf of the association, enforce

the bylaws voting provision when it cancelled the 2010 annual meeting?

Before addressing the two questions, it is important to note that the *Chesnut* formulation is

used to determine whether a party should be sanctioned for a violation of the automatic stay.  It does

not determine whether there has been a violation of the automatic stay.  Determining whether the act

violates the stay is only one of three prongs of the *Chesnut* formulation.  It is also important to

emphasize that while advice of counsel may be relevant in determining a sanction, it is not relevant

in determining whether there has been a stay violation.  "Whether the party believes in good faith

that it had a right to the property is not relevant to whether the act was 'willful'."  *Goichman v.*

*Bloom (In re Bloom),* 875 F.2d 224, 227 (9th Cir.1989) (quoting *INSLAW, Inc. v. United States (In*

*re INSLAW, Inc.),* 83 B.R. 89, 165 (Bankr.D.D.C. 1988)); *Fleet Mortg. Group, Inc. v. Kane,* 196

F.3d 265, 269-70 (1st Cir.1999) ("A good faith belief in a right to the property is not relevant to a

determination of whether the violation was willful."); *In re Manuel,* 212 B.R. 517

(Bankr.E.D.Va.1997) ("The court accepts [the creditor's] evidence that he did not believe he was

in violation of the stay by failing to dismiss the garnishment.  However, his belief does not preclude

a finding of willful violation.").  A party's violation of the automatic stay may be unknowing or may

13

be knowing and willful.  In either case, the automatic stay is violated.  His conduct may be the result of advice of counsel, but it is the conduct that violates the stay.

## 1.  Does Enforcement of Bylaws Section IV, Section 7 Violate the Automatic Stay?

The automatic stay prohibits all acts to collect a pre-petition debt.[4]  Not only are obvious acts such as suing a debtor or enforcing a judgment prohibited, but less direct acts are also prohibited. For example, withholding a college transcript violates the automatic stay.  *Andrews University v. Merchant (In re Merchant),* 958 F.2d 738, 741- 742 (6th Cir.1992).  Mailing letters and bills even though there is no threat to sue or take other collection action violates the automatic stay.  *In re Robinson,* 2008 WL 4526183 (Bankr.E.D.Va.2008) ("By sending the invoices to the debtor, [the creditor] effectively sought payment of the pre-petition amounts outside of the bankruptcy case, and as such, her actions violated the automatic stay");  *In re Torres Lopez,* 2006 WL 3898307 (Bankr.D.P.R. 2006) (letter advising that water, electricity and phone services in a condominium would be discontinued); *In re Crudup,* 287 B.R. 358 (Bankr.E.D.N.C.2002) (letters to debtor's wife and parents-in-law); *In re Wills*, 226 B.R. 369, 378 (Bankr.E.D.Va.1998) (post-petition invoices); *In re Smith,* 185 B.R. 871 (Bankr.M.D.Fla.1994) (letter to debtor's employer); *Sechuan City, Inc. v. North American Motor Inns, Inc. (In re Sechuan City, Inc.),* 96 B.R. 37 (Bankr.E.D.Pa.1989) (landlord posting signs at debtor-restaurant urging public not to patronize restaurant); *In re Aponte,* 82 B.R. 738 (Bankr.E.D.Pa.1988) (landlord terminating electric service).  Denying a condominium unit owner the right to vote at an annual or special meeting because pre-petition condominium fees are past due is similarly prohibited.  It pressures a unit owner to pay his past due, pre-petition

---

[4]Section 362(a)(6) provides that "a petition .  .  . operates as a stay, applicable to all entities, of .  .  . any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case."

condominium fees by withholding something of value until the pre-petition assessment is paid.   The
bylaws voting provisions do not come into play unless a unit owner fails to pay his condominium
fees.   They are not imposed in any other circumstance.   They are effective only so long as the unit
owner is delinquent.

The association argues that the bylaws voting provisions have nothing to do with the
collection of condominium fees but are matters of fundamental fairness: Those that do not bear their
burden of paying their fair share of the common expenses should not have the benefit of voting.
There are a number of problems with the argument.   The most difficult problem for the association
to explain under its benefit/burden rationalization is that the disability to vote attaches to the
member, not the unit for which there is a delinquency.   This means that if a unit owner owns more
than one unit, he may not exercise his right to vote for any unit he owns, notwithstanding that only
one unit is delinquent.   That is the situation in this case.   This has been the consistent interpretation
and application by the association, an interpretation and application which the debtor does not
challenge.   This magnifies the nonpayment penalty, adding more pressure to pay the delinquency,
but under the association's rationale a unit owner who is fully carrying his burden to pay
condominium fees for all units he owns except one, is denied the benefit of voting for all the units
he owns, even those that are current in the payment of condominium fees assessed against them.

Another difficulty with the association's benefit/burden explanation is that it does not
account for the fact that a delinquent unit owner continues to enjoy the economic benefits of the
condominium's amenities and services.   *See* Bylaws Article IX, Section 5 and Article X. Only the
right to vote is affected, not the ability of the unit owner to utilize the condominium's amenities and
services.   It would seem that under the benefit/burden explanation, withholding enjoyment of the

condominium's amenities and services would be fairer than withholding the right to vote. The condominium's amenities and services actually cost money and there may be cost savings, however small, if a delinquent unit owner does not utilize them. The correlation between nonpayment of assessments and withholding the use of amenities and services is stronger and more direct than between nonpayment and withholding the right to vote.

There are other difficulties. The rationale does not account for the fact that serving as a director is a burden on a unit owner and a benefit to the association. Serving as a director involves time and effort which benefit the association notwithstanding that the director may be delinquent in the payment of his condominium fees. It does not distinguish between genuine disputes between a unit owner and the association or inadvertent tardiness in payment. It does not explain the mismatch between the temporal congruence of the offense and the penalty. One can be permanent while the other is temporary. If a unit owner is delinquent at the time of the annual meeting, he forever loses his ability to vote at that meeting, notwithstanding that he later pays the assessment in full. (The disability to vote does not excuse the unit owner from paying the assessment or prevent the association from taking legal action to enforce it.)

Notwithstanding the asserted justifications for the bylaws voting provisions, they exert pressure on unit owners who are past-due in the payment of their condominium fees by more than 30 days to pay those fees. They are efforts to collect a debt.[5] Even if the bylaws voting provisions

---

[5]The association's back-up argument is that the association is not denying the debtor its right to vote. Under Bylaws Article IV, Section 7, it argues, a unit owner's right to vote exists only if the unit owner is not more than 30 days past due in the payment of his condominium fees. Since the debtor is past due in the payment of condominium fees, it just does not have a right to vote in the first place. Thus, the association is not taking any action to deny the debtor his right to vote. Alternatively, the association argues, the debtor's right to vote is limited or encumbered with a restriction, that is, that the right to vote may not be exercised if a unit owner is more than thirty days past due in the payment of his condominium fees. In this case, the restriction or encumbrance arose prior to the filing of the petition in bankruptcy. Under the Bankruptcy Code, property of a debtor that becomes property of the estate does so subject
(continued...)

also serve other purposes, they remain efforts to collect past-due condominium assessments and violate the automatic stay.  An act in violation of the automatic stay may have other legitimate purposes, but if it is also an act in violation of §362(a), the other purposes do not excuse violating or disregarding §362(a).

If the unit owners association properly invoked Bylaws Article IV, Section 7 pre-petition, it must stop using it when the unit owner files bankruptcy.  A creditor who properly takes an act prior to the filing of a petition in bankruptcy to collect a debt, must stop the act upon the filing of the petition.  "It is well established that even a technical stay violation (one committed without knowledge of the stay) can become willful .  .  . if the creditor fails to remedy the violation after receiving notice of the automatic stay."  *Kline v. Tiedemann (In re Kline),* 424 B.R. 516, 524 (Bankr.D.N.M.2010).  A creditor who caused a state court to issue a civil bench warrant for the arrest of a debtor who, pre-petition, failed to appear in state court to answer interrogatories must cause the

---

[5](...continued)

to all restrictions existing when the petition in bankruptcy is filed.  Thus, the association is not taking any action to deny the debtor its right to vote because the debtor's right to vote was restricted at the time it filed bankruptcy.

The arguments are not well taken.  The Virginia Condominium Act makes clear that when a condominium unit owner's right to vote is created, it is not created subject to a condition, a limitation or a restriction.  The right to vote is an integral and inseparable part of the condominium regime itself.  At this condominium, and in most others, votes are allocated in accordance with the undivided interests in the common elements.  Va.Code (1950) §55-79.77(A).  The allocation of the undivided interests in the common elements was determined under Va.Code (1950) §55-79.55(B).  The undivided interest in the common elements allocated to each unit may not be altered and may not be separated from the unit itself.  Va.Code (1950) §55-79.55(f).  The number of votes appertaining to any unit may not be altered.  Va.Code (1950) §55-79.71(E)(iv).  These provisions may not be altered by agreement and may not be waived.  Va.Code (1950) §55-79.41:1.  While the number of votes appertaining to condominium units or the weight of unit owner's votes may vary from unit to unit, every unit owner has the right to vote.  The right to vote does not fade in and out depending on whether condominium fees are paid or unpaid or on any other circumstance.  Each condominium unit has as an inseparable bundle of rights that constitutes the condominium unit.  The right to vote is a part of those inseparable rights.

Whether described as a condition precedent to the right to vote or as a restriction on the right to vote, the provision becomes effective only upon non-payment of condominium fees for a period of thirty days.  The intended effect is to bring pressure on delinquent unit owners to pay their delinquent fees.  It is only one remedy an association to collect delinquent condominium fees.  Others include filing suit for the unpaid condominium fees or filing and enforcing a lien.  Va.Code (1950) §55-79.84; Bylaws Article IX, Section 4 and 5.  While the use of Bylaws Article IV, Section 7 may be an effective remedy, the automatic stay prevents its application after a bankruptcy petition is filed.

17

bench warrant to be withdrawn when the debtor files bankruptcy. *Galmore v. Dykstra (In re Galmore),* 390 B.R. 901, 909-14 (Bankr.N.D.Ind. 2008). A creditor who issues a garnishment before a debtor files bankruptcy has the affirmative duty to promptly dismiss the garnishment upon filing of the bankruptcy petition. *In re Manuel,* 212 B.R. 517, 519 (Bankr.E.D.Va. 1997); *Baum v. United Va. Bank (In re Baum),* 15 B.R. 538, 541 (Bankr.E.D.Va. 1981) (creditor has the "responsibility to stop the downhill snowballing of a continuing garnishment."); *In re Scroggin,* 364 B.R. 772, 779 (B.A.P. 10th Cir. 2007). A creditor who repossessed a debtor's car pre-petition, but has not sold it before the debtor files bankruptcy, must release the car back to the debtor. *In re Brown,* 237 B.R. 316 (Bankr.E.D.Va. 1999); *In re Young,* 193 B.R. 620, 621 (Bankr.D.D.C. 1996) (seized vehicle must be returned upon debtor giving adequate assurance). A creditor who took a default judgment shortly after the filing of a petition in bankruptcy albeit without knowledge of the filing of the petition, violated the automatic stay by failing to vacate the default judgment once it became aware of the filing of the petition. *Keen v. Premium Asset Recovery Cor. (In re Keen),* 301 B.R. 749, 753 (Bankr.S.D.Fla.2003) (failure to take action to undo an innocent violation of the automatic stay constitutes a willful violation of the stay). This case is no different. If the act to collect the past due condominium fees (that is, invoking Bylaws Article IV, Section 7 denying the debtor its right to vote) commenced before the bankruptcy was filed, the unit owners association must stop the act after the filing of bankruptcy by permitting the debtor to vote. The fact that the penalty for not timely paying condominium fees is in the bylaws changes nothing. It is an act, and, if continued, it violates the automatic stay.

The court concludes that enforcing Bylaws Article IV, Section 7 for a past-due pre-petition condominium fee violates the automatic stay.[6]

## 2.  Did the Board Enforce the Bylaws Article IV, Section 7 When it Cancelled the 2010 Annual Meeting?

The second question presented is whether the board of directors, acting on behalf of the association, enforced the bylaws voting provision when it cancelled the 2010 annual meeting.  The court concludes that the board's act on September 28, 2010, of cancelling the 2010 annual meeting that it had previously called and was required by its own bylaws to call and to hold violated §362(a).

There has been a long-standing dispute between the board and the debtor over money the board claims the debtor and CSI owe the condominium:  in the case of the debtor, $315,673.36 for recalculated condominium assessments on the debtor's restaurant unit and in the case of CSI, $366,125.00 for compensatory and punitive damages.  The board unsuccessfully sought to hold the debtor liable for the CSI indebtedness in state court and continues to do so in this bankruptcy case.[7] At first blush, the dispute appears to be similar to so many others that find their way to court.  Voting rights at an annual meeting of a condominium association are generally a remote consideration.  This case is different.  The board of directors is elected by the unit owners.  In this condominium, the debtor holds about 20% of the votes in the association.  The quorum for an annual meeting is 50% and the association has a history of having difficulty obtaining this quorum.  A quorum has not been obtained since 2006.  With a continuation of past practices, it is likely that if a quorum is achieved

---

[6]The same analysis applies to Bylaws Article V, Section 7.

[7]The condominium association obtained its judgment against CSI in a suit in state court in which it sought to recover against both CSI and the debtor.  The jury returned a verdict only against CSI.  In this bankruptcy case, the association is seeking to substantively consolidate the two bankruptcy cases so that the CSI judgment would be a claim against the consolidated estate.  The CSI estate is insolvent.  The debtor in this case is illiquid, but solvent.  Its equity in its condominium units appears to be more than sufficient to satisfy all claims in both cases.

at an annual meeting it will not be much in excess of 50%. This means that the debtor with its 20%

of the votes in the association (40% of the votes at an annual meeting if a bare quorum of 50% is

achieved) is likely to have a significant impact on the outcome of an election for the board of

directors, particularly if it has any other support, as it did in 2009.

The debtor would like to change the membership of the board of directors. It disagrees with

the manner in which the current board is managing the condominium and would like a more

sympathetic board with which to seek a resolution of the assessment dispute.

The incumbent board members can count votes. They are committed to collecting the

moneys owed by the debtor and CSI. They recognize – maybe fear – that the debtor, by exercising

its votes, may avoid paying the judgment and the recalculated assessments by obtaining a more

sympathetic board. The board has furthered its collection efforts by enforcing the bylaws voting

provision and preventing the debtor from voting at the annual meetings. It recognizes the importance

to the debtor of its right to vote. By denying the debtor its right to vote, the board brings pressure

on the debtor to pay the recalculated assessment.

The board has been and is putting pressure on the debtor to pay the recalculated assessment.

Enforcement of the bylaws voting provision prevents the debtor from acting on its concerns about

the management of the association and from attempting to obtain a more sympathetic board to

resolve the payment dispute on terms more acceptable to itself. The only means the association had

to deny the debtor its right to vote was enforcement of the bylaws voting provision. The means of

enforcing the bylaws voting provision by cancelling the 2010 annual meeting was different, but the

effect was the same. In an effort to avoid the consequences of denying the debtor its right to vote

by enforcing the bylaws voting provision, it sought another tactic to achieve the same result. It

cancelled the annual meeting.  The board of directors simply sought to disguise what it was doing.

It attempted to do indirectly what it could not do directly.

The board cannot argue that cancelling the annual meeting was equivalent to doing nothing

and that doing nothing cannot be a violation of the automatic stay.  The failure to act when one has

a duty to act violates the automatic stay.  The failure to release a pre-petition wage garnishment

violates the automatic stay.  *In re Manuel,* 212 B.R. 517, 519 (Bankr.E.D.Va.1997).  The failure to

return a vehicle repossessed pre-petition violates the automatic stay.  *In re Brown,* 237 B.R. 316

(Bankr.E.D.Va. 1999)(recognizing split between absolute duty to return seized vehicle and duty

conditional on debtor providing adequate protection); *In re Young,* 193 B.R. 620, 621 (Bankr.D.D.C.

1996) (adequate protection required before duty to return seized vehicle).  The failure to obtain

prompt relief when a bank freezes a bank account as permitted by *Citizens Bank of Maryland v.

Strumpf,* 516 U.S. 16, 116 S.Ct. 286 (1995) is a violation of the automatic stay.  *In re Schafer,* 315

B.R. 765 (Bankr.D.Colo. 2004).

The failure to hold the 2010 annual meeting when it was required to be held by its own

bylaws is a violation of the automatic stay.  Bylaws Article IV, Section 2 ("[T]he annual meetings

of the members .   .   . shall be held on the first Wednesday of October").  By failing to hold the

meeting, the board denied the debtor its right to vote at the annual meeting, simply camouflaging its

enforcement of the bylaws voting provision.  The evidence shows a consistent pattern of denying the

debtor its right to vote by enforcing the bylaws voting provision.  Prior to the filing of the petition

in bankruptcy, it enforced the bylaws voting provision openly and directly as to all of the debtor's

units because the restaurant unit had not paid the recalculated assessment.  At the October 2009

annual meeting, the debtor was denied its effective vote by the misconduct of the president of the

21

association who presided at the annual meeting.  In addition, in an effort to prevent a quorum at the

2009 annual meeting, members of the board of directors who were present were not counted for

quorum purposes.   Nonetheless, they participated in the meeting by making and seconding the

motion to adjourn sine die.   The board denied the debtor's request in the summer of 2011 for a

special meeting although the request was valid on its face and mandated by the bylaws.  Bylaws

Article IV, Section 3 ("It shall be the duty of the President to call a special meeting of the members

. . . upon a petition signed by members representing at least twenty percent (20%) of the total votes

of the Project having been presented to the Secretary.").  Ex. 6.  Cancellation of the 2010 annual

meeting was a continuation of this same conduct.

The board of directors gave two reasons for cancelling the 2010 annual meeting – the flyer

and the horns of a dilemma.  Neither is availing.  The board argued that the flyer was an unlawful

raffle and proxies submitted in response to it were invalid.  Because it was impossible to distinguish

which – if any – proxies were submitted in response to the flyer, all proxies were tainted.[8]  Counsel's

opinion was itself without meaningful analysis.  There was minimal analysis of what constituted a

"thing of value" and no analysis of the difference between a lawful door prize or host gift and an

unlawful raffle or lottery.

Title 18.2, Chapter 8, Article 1 of the Virginia Code addresses gambling.  "It is well settled

that 'an activity constitutes illegal gambling when the elements of prize, chance and consideration

---

[8]Counsel also opined that some of the proxies might be invalid because they might be signed in blank, that is, signed by the unit owner before the name of the proxy holder was filled in.  (The flyer did not request blank proxies or suggest that they be signed in blank.  Nor did it ask that it be named as the proxy holder.)  Counsel cited no authority for this proposition in his written opinion or in his testimony in court and there is no evidence that he offered any in his oral opinion to the board.  The court is unable to find any in the association's bylaws, the Condominium Act or the Virginia Nonstock Corporation Act.  The Condominium Act sets out the requirements for proxies in §55-79.77(D).  It provides no support for counsel's argument.  Proxies delivered directly to the association are susceptible to the same circumstance.  Counsel does not explain why they are not also tainted.

are present together.'" Op.Va.Att'y.Gen., 2010 WL 3184154 (July 30, 2010) (quoting 2002

Op.Va.Att'y.Gen. 144, 145). The principal statutory provisions applicable to the flyer are Va.Code

(1950) §18.2-325(1) which defines "illegal gambling" and §18.2-332 which addresses what does not

constitute consideration. "Illegal gambling" is defined as:

> the making, placing or receipt of any bet or wager in the Commonwealth of money
> or other thing of value, made in exchange for a chance to win a prize, stake or other
> consideration or thing of value, dependent upon the result of any game, contest or any
> other event the outcome of which is uncertain or a matter of chance, whether such
> game, contest or event occurs or is to occur inside or outside the limits of the
> Commonwealth.

Va.Code (1950) §18.2-325(1) (2010). Section 18.2-332 states:

> In any prosecution under this article, no consideration shall be deemed to have passed
> or been given because of any person's attendance upon the premises of another; his
> execution, mailing or delivery of an entry blank; his answering of questions, verbally
> or in writing; his witnessing of a demonstration or other proceeding; or any one or
> more thereof, where no charge is made to, paid by, or any purchase required of him
> in connection therewith.

Va.Code (1950) §18.2-332 (2010).

The Attorney General discussed the three elements and prior opinions of the Attorney

General in his July 30, 2010 opinion and concluded that the promotion scheme described to him was

not illegal gambling because consideration was absent. *Id.* The absence of the type of analysis

undertaken by the Attorney General by counsel is telling.

It is also interesting that there is no evidence of a discussion of the reason for the flyer . The

reason was expressly stated on the flyer: "In order to encourage participation in the FOA Annual

Meeting". Ex. 8. Every board member knew that attendance at the last three annual meetings had

been insufficient to obtain a quorum. The flyer proposed a way to increase attendance. It offered

an HDTV to a unit owner "selected at random from among all unit owners who register their votes

23

for quorum purposes".  Had the board been interested in achieving a quorum after three annual meetings without a quorum, it would have seized on the idea, adopted it, corrected any problems with it and run with it.  At least it would have discussed it.  The only evidence of a discussion was a discussion of why the proposed drawing was unlawful and why the meeting needed to be postponed to re-solicit proxies.  Seizing upon the flyer, counsel opined and the board agreed that the meeting should be postponed to cure the taint that could have arisen from the flyer.  That was a makeweight argument.  Although corrective action could have been taken immediately and the meeting held, albeit after a short postponement, no action was ever taken to reschedule the annual meeting.

The flyer was a fortuitous circumstance that counsel sought to hang his hat on so that the board could have a reason to postpone the meeting unrelated to the voting status of the debtor.  It achieved the same result as enforcing the bylaws voting provision, but ostensibly without enforcing it.  Cancelling the annual meeting because of the flyer was a mere subterfuge.

The second reason was the "insoluble dilemma" argument and consequent need for a "final decision" from "the federal courts" of the question on the enforceability of the bylaws voting provision.  Without a "final decision", counsel opined, the board was in an "untenable" position.  Opinion of Counsel, Ex. 10 at 1.  Counsel's recommendation, in his words, was:

> [W]e believe the Board should postpone the meeting until such time as a final decision has been obtained from the federal courts as to whether enforcement of the vote eligibility requirements of the Association's Bylaws violates the automatic stay.

*Id.*

The association did not diligently seek a final decision.  It was obvious from the first day of this bankruptcy case that there was a dispute as to the effect of the automatic stay on the bylaws

voting provision.  The debtor filed its petition on October 2, 2009.  It immediately sought an

injunction seeking to compel the association to recognize its vote at the scheduled October 7, 2009

annual meeting.  A preliminary injunction was denied because there was an insufficient record.

After the meeting, the debtor amended its complaint to allege that the association violated the

automatic stay at the October 7, 2009 annual meeting.  The court found that enforcing the bylaws

voting provision violated the automatic stay but that the association did not enforce it at that meeting.

Despite prevailing, the association appealed.

        The appeals were unnecessary and delayed a final decision.  The District Court held that the

association had no standing to appeal and expressly stated that this court's statements about the

enforcement of the bylaws provision being a violation of the automatic stay were not controlling.[9]

This clearly left the association the ability to litigate the issue again and obtain appellate review if

it was dissatisfied with a ruling in a later case.  Instead, the association appealed to the Court of

Appeals which also found it had no standing.  This decision was more than 20 months after the

bankruptcy case was filed.  In these intervening 20 months, the association took no action to obtain

a "final decision."  It simply played for time – time to pressure the debtor to pay the recalculated

assessment by enforcing the bylaws voting provision.

        The association had the ability to promptly obtain a final decision.  One cardinal rule of

bankruptcy practitioners is, if there is doubt as to whether the automatic stay applies, file a motion.

---

        [9]A prevailing party has no standing to appeal.  *Deposit Guaranty Nat. Bank v. Roper,* 445 U.S. 326, 333, 100
S.Ct. 1166, 1171 (1980) ("Ordinarily, only a party aggrieved by a judgment or order .  .  . may exercise the statutory
right to appeal therefrom.")  The association was not collaterally estopped by this court's discussion of the bylaws voting
provision.  The association prevailed in the first litigation because this court found that it did not enforce the bylaws
voting provision.  In order for a party to be collateral estopped by the adjudication of an issue in a prior proceeding, the
issue determined must have been necessary to the outcome of the case.  In the prior adjudication, it was not necessary.
The same result would have occurred whether or not enforcement of the bylaws voting provision was a violation of the
automatic stay.  If there was any doubt on this issue, the District Court was explicit.

Assert that the stay does not apply and request, in the alternative, that if it does apply, that relief from it be granted. Or, simply file a motion for relief from the automatic stay. *See Zeisler & Zeisler, P.C. v. Prudential Ins. Co. (In re JLM, Inc.),* 210 B.R. 19, 22 (BAP 2nd Cir. 1997) ("Although Prudential did not believe it necessary . . . [it] moved for relief from the automatic stay"). This court has a regularly scheduled hearing day for motions for relief from the automatic stay about every two weeks. The Bankruptcy Code requires a prompt resolution, generally within 30 days after a motion for relief from the automatic stay is filed. 11 U.S.C. §362(e). If the association had wanted a final decision it could have had one. If it did not obtain a favorable decision in this court, it could appeal to the District Court, or perhaps, have taken a direct appeal to the Court of Appeals. 28 U.S.C. §158(d)(2). An appeal to the District Court would certainly have been decided prior to the 2010 annual meeting and most likely an appeal to the Court of Appeals would also have been decided before the 2010 annual meeting.[10]  The association never filed such a motion. It was playing for time. It wanted to bring pressure on the debtor to pay its pre-petition debt by enforcing the bylaws voting provision. The dilemma argument was a ruse. Any dilemma the association faced was one of its own making.

## Conclusion

The board of directors refused to hold the 2010 annual meeting, a meeting that was required by its bylaws. It did so with knowledge of the pendency of the bankruptcy case and the automatic stay, with the guidance given by this court in its written Memorandum Opinion that the automatic

---

[10]In addition to enabling the board of directors to quickly obtain the final decision it says it needed, the motion would have avoided exposing the association to a claim for sanctions by obtaining the decision prior to the board taking any action.

26

stay prohibited the enforcement of the bylaws voting provision, and with the advice of counsel that

enforcing the bylaws voting  provision could result in action adverse to the association in the

bankruptcy court  The decision of the board to postpone the 2010 annual meeting was an indirect

means to enforce the bylaws voting provision and bring pressure on the debtor to pay the pre-petition

delinquency.  The failure to hold the 2010 annual meeting violated the automatic stay imposed by

§362 of the United States Bankruptcy Code.

The association will be held in contempt of this court for its violation of the automatic stay.

The court will sanction the association $100,000.00 but will give it the opportunity to purge its

contempt by holding on October 5, 2011, a full, fair and transparent 2011 annual meeting at which

the debtor will be permitted to vote, its votes will be counted and it may hold office as a director of

the association, if elected.

Alexandria, Virginia
September 20, 2011

/s/Robert G. Mayer
Robert G. Mayer
United States Bankruptcy Judge

Copy electronically to:

Donald F. King
Jennifer L. Sarvadi

17059

27