# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| In re:<br><br>GORDON PROPERTIES, LLC, and<br>CONDOMINIUM SERVICES, INC.,<br><br>    Debtors. | Case No.  09-18086-RGM<br>(Jointly Administered)<br>(Chapter 11) |
| GORDON PROPERTIES, LLC,<br><br>    Plaintiff,<br><br>vs.<br><br>FIRST OWNERS' ASSOCIATION OF<br>FORTY SIX HUNDRED CONDOMINIUM,<br>INC.,<br><br>    Defendant. | Adv. Proc. No. 11-1020-RGM |

## MEMORANDUM OPINION

This case was before the court on March 26, 2013, on First Owners' Association's Motion to Approve the Service Agreement with Condominium Services, Inc. (Docket Entry 326).[1] The court continued the hearing on the motion because the issues were not fully developed. This Memorandum Opinion addresses some, but not all, of the issues of concern to the court and to aid the parties in preparing for the continued hearing on this matter.

## Background

The relations between Gordon Properties, LLC and Condominium Services, Inc., on the one

---

[1] All docket entries refer to the docket in this adversary proceeding, unless otherwise noted.

hand, and First Owners' Association of Forty Six Hundred Condominium, Inc., on the other, have been adversarial for more than six years. A very brief history is in order to better understand the context of this motion. More complete histories are available in prior opinions of this and other courts. Forty Six Hundred Condominium consists of a high-rise building with about 400 condominium units and two separate structures, one now used as a restaurant and the other as a gas station, each of which is a separate condominium unit. Gordon Properties owns the restaurant unit and about 39 units in the high-rise building. The condominium association, which is also called FOA, is managed by a seven-person board of directors who are elected to staggered two-year terms. There were no elections for members of FOA's board of directors in 2007, 2008, 2009 or 2010, either because the incumbent board cancelled the annual meeting or no quorum was achieved. Until June 2012, FOA was managed by the directors elected in 2005 and 2006 and successor directors appointed by the incumbent directors none of whom were affiliated with Gordon Properties. The 2011 annual meeting, held in October 2011, and the election of the board of directors was held under the supervision of this court. The contested issues were resolved by two orders, the first dated June 15, 2012 and the second dated July 23, 2012. Three individuals affiliated with Gordon Properties were elected to the board for two-year terms ending in October 2013.

Condominium Services, Inc., also called CSI, is a wholly-owned subsidiary of Gordon Properties. It was organized in the late 1970s and, with a few exceptions, was the managing agent for FOA until 2006 when the board terminated its contract. Litigation ensued which ended in a substantial judgment against CSI and in favor of FOA. FOA filed a proof of claim for $453,533.12 which consisted of $161,792 for damages, $275,000 for punitive damages, $11,654.44 for prejudgment interest and $5,086.68 for post-judgment interest.

The Gordon Properties and CSI bankruptcy cases were administratively consolidated by a consent order entered on September 29, 2010. (*In re Gordon Properties, LLC,* Case No. 09-18086 (Bankr.E.D.Va.), Docket Entry 102). The consent order, in addition to providing for the joint administration of the two bankruptcy cases, also provided that Gordon Properties was authorized to make equity contributions to CSI that were reasonable and necessary to enable CSI to pay its monthly expenses in the ordinary course of its business, including professional fees approved by the court. Gordon Properties has been authorized to incur subordinated secured debt to fund its operations and the professional fees in the bankruptcy case. The lenders are the four owners of Gordon Properties. To date, three orders authorizing this borrowing have been entered. They authorize a total of $1.7 million. Orders dated April 13, 2011 (*In re Gordon Properties, LLC,* Case No. 09-18086 (Bankr.E.D.Va.), Docket Entry 200) ($500,000.00); April 12, 2012 (*In re Gordon Properties, LLC,* Case No. 09-18086 (Bankr.E.D.Va.), Docket Entry 387) ($700,000.00); and March 27, 2013 (*In re Gordon Properties, LLC,* Case No. 09-18086 (Bankr.E.D.Va.), Docket Entry 552) ($500,000.00). It is not clear from the monthly operating reports how much Gordon Properties has contributed to the capital of CSI since September 29, 2010. The balance sheet as of February 28, 2010 showed paid-in-capital of CSI of $933,360.14. *In re Condominium Services, Inc.,* Case No. 10-10581, Monthly Operating Report at 12 (Docket Entry 26). The balance sheet as of January 31, 2013 showed paid-in-capital of CSI of $1,103,560.14. *In re Gordon Properties, LLC (administratively consolidated with Condominium Services, Inc.),* Case No. 09-18086-RGM, Monthly Operating Report at 9 (Docket Entry 520).

This court's June 15, 2012 order resolving the election issues provided that CSI could not accept employment from FOA during the pendency of it bankruptcy case without the prior approval

of this court. On October 12, 2012, FOA filed a Consent Motion to Approve Engagement of Joe Riviere of Condominium Services, Inc. (Docket Entry 283). It sought to employ Joe Riviere of CSI as an interim manager for FOA to replace the former building manager who had resigned in March 2012. Between March 2012 and October 12, 2012, FOA employed Summit Management to act as building manager. Summit resigned, effective September 30, 2012. FOA's annual meeting was held on October 3, 2012 and the newly elected board of directors decided to employ Joe Riviere of CSI "to assume the role of a temporary, interim manager, on substantially the same terms and conditions as Summit Management had previously served, while FOA undertakes a diligent search for a permanent manager." First Owners' Association's Motion to Approve the Service Agreement with Condominium Services, Inc. ("Consent Motion") at ¶10 (Docket Entry 326). FOA expected that the search for a permanent manager would "take up to a few months." *Id.* at ¶13. CSI consented to the motion.

The motion did not discuss, but the court was aware, that FOA held a judgment against CSI in the amount of $453,533.12; that Gordon Properties obtained a judgment, now on appeal, against FOA for $277,063.17 on June 27, 2012 (Docket Entry 225); that Gordon Properties had issued a garnishment against FOA's cash accounts – including both its operating and reserve accounts – to enforce its judgment on August 1, 2012; and that the garnishment had been quashed on August 17, 2012, subject to posting a bond (Docket Entry 259).

On September 13, 2012, this court referred the parties to mediation with the Hon. Kevin R Huennekens. The mediation resulted in a settlement agreement. A motion to approve the compromise under Fed.R.Bankr.P. 9019 was filed on January 28, 2013 and is pending before the court.

## Motion to Approve Service Agreement with CSI

FOA filed the Consent Motion on March 12, 2013 (Docket Entry 326). The motion recites the prior orders of this court requiring court approval before CSI may accept employment by FOA and the order allowing Mr. Riviere of CSI to be employed temporarily while a search was made for a permanent management company. Motion at ¶1-4. It states that a draft Request for Proposal ("RFP") for a permanent, full-service management company prepared by Mr. Riviere was discussed at the board meeting on November 15, 2012 and again on November 27, 2012. At the November 27, 2012 meeting, the board modified the draft RFP, approved it and directed Mr. Riviere to send it to seven management companies. *Id.* at ¶5-7. During Mr. Reviere's tenure as temporary general manager, Cardinal Management handled FOA's financial matters. On the same day that the board approved the RFP, it gave Cardinal Management 90 days notice of termination of its contract. *Id.* at ¶6. Responses to the RFP were due by December 18, 2012. Cardinal Management was one of the seven companies to whom the RFP was directed. It responded to the RFP stating that it declined to submit a proposal. Armstrong Management Services and CSI responded. The other four recipients of the RFP did not respond. *Id.* at ¶8. The board met and, on Bryan Sells' motion, approved CSI's proposal.[2] The board voted 5 to 2 for approval of the contract with the three Gordon Properties-affiliated directors voting in favor of the motion. The non-Gordon Properties-affiliated directors split 2 to 2. *Id*. at ¶9. The board referred the matter to the Special Litigation Committee to finalize the terms of the proposed contract with CSI. *Id.* at ¶9. The Special Litigation Committee employed Eileen M. Johnson of Whiteford, Taylor Preston LLP to represent it in negotiating the terms of the contract. She negotiated on the terms of the contract with CSI which was represented

---

[2]Mr. Sells is one of four owners of Gordon Properties and one of three Gordon Properties-affiliated directors of FOA.

by Donald F. King, and obtained several changes to the draft contract CSI submitted. *Id.* at ¶¶10-11. Further negotiations were undertaken. *Id.* at ¶12-14. The final contract was approved by the board on February 19, 2013 by a vote of 4 to 3. All three Gordon Properties-affiliated directors voted in favor of the contract. *Id.* at ¶14.

A hearing was held on March 26, 2013, on FOA's motion to allow CSI to enter into the management contract with it. The evidence at the hearing generally followed the recitals in the motion. The court continued the hearing so that further evidence could be developed.

## Discussion

### Legal Standards for Approval of Contract

Approval of the proposed management contract requires the court find that there is a management contract that would be binding on both parties if approved and that the contract is within the debtor's sound business judgment. 11 U.S.C. §363(b)(1).

The first prong of the two-step analysis, whether there is an enforceable contract, is a necessary precondition to approval. "A motion to compromise is made once the parties have reached an agreement upon which the compromise may be based." *In re Frye,* 216 B.R. 166, 170 (Bankr.E.D.Va. 1997). If the proposed contract will not bind the parties, there is nothing for the court to review or approve. Most often, it is readily apparent that there is a contract that will be binding on both parties when approved by the court and little attention is given to the issue. But, if there is a question, the issue must be addressed. For example, in *Frye,* the trustee reached an oral settlement of a claim. After the trustee filed a motion seeking approval of the settlement and noticed it for a hearing, the counterparty sought to withdraw from the settlement agreement. The court

stated:

> In order to grant the trustee the authority to compromise a claim, an agreement or at least a proposed agreement must be in place between the parties. *See* Rule 9019(a); *Parkview Hospital–Osteopathic [Medical Center],* 211 B.R. [603]at 607–09 [(Bankr.N.D.Ohio 1996)](noting that proposed agreement is sufficient to seek court approval for authority to compromise).

*Id.* at 170. The court then considered whether there was an offer, an acceptance and consideration. *Id.* at 170-171. Finding these elements, it then addressed whether an oral agreement was sufficient and found under state that it was – the settlement agreement did not have to be reduced to writing. *Id.* at 171-172.

After the court determined that there was a valid, enforceable settlement agreement that was subject to court approval, it proceeded to the second prong of the analysis, whether the settlement agreement should be approved. *Id.* at 175. *See In re Wood,* 2008 WL 2244972 (Bankr.E.D.Va. May 30, 2008); 2008 Bankr.LEXIS 1783 (Bankr.E.D.Va. May 30, 2008) (examining enforceablity of specific terms in letter of intent for sale of debtor's radio stations). While *Frye* was a motion to approve a settlement under Fed.R.Bankr.P. 9019, the same principle applies when the court is called upon to approve a contract between the debtor and a third party. The court must first determine whether there is an agreement. *See also Rahmi v. Trumble (In re Bon-Air Partnership),* 2013 WL 1459241 at *5 (4th Cir. April 11, 2013)(finding the contract was an arms-length transaction, free from fraud or collusion and made in good faith).

In *Frye* the issues were basic contract issues: Was there an offer? Was there an acceptance? Did the agreement need to be in writing? These all went to contract formation. Here, there is no question as to whether a contract was negotiated, the terms were agreed upon or if the agreement was reduced to writing. The issues are different, but still go to contract formation. They are issues

7

of authority and conflict of interest. If there is a conflict of interests, the contract may be voidable. Va.Code (1950) §13.1-871(A). The conflict issues are highlighted by the complaint that eleven unit owners filed against the three Gordon Properties-affiliated directors and FOA in state court. *Sobol v. Sells,* Adv.Proc. 12-1562-RGM.[3] While that suit is directed to the settlement agreement between FOA and Gordon Properties and not the CSI contract, the same issues exist with respect to the CSI contract. The *Sobol* plaintiffs assert that the three Gordon Properties-affiliated directors cannot participate in the consideration by FOA of the settlement agreement. They assert that there is a conflict of interest and that they must recuse themselves from participation. FOA is a non-stock corporation organized under the Virginia Non-Stock Corporation Act and these issues are likely controlled by Va.Code (1950) §13.1-871.[4]

---

[3]The case was removed to this court. A motion to remand is pending.

[4]Section 13.1-871. Director Conflict of Interests, states as follows:

A. A conflict of interests transaction is a transaction with the corporation in which a director of the corporation has an interest that precludes him from being a disinterested director. A conflict of interests transaction is not voidable by the corporation solely because of the director's interest in the transaction if any one of the following is true:

1. The material facts of the transaction and the director's interest were disclosed or known to the board of directors or a committee of the board of directors and the board of directors or committee authorized, approved or ratified the transaction;

2. The material facts of the transaction and the director's interest were disclosed to the members entitled to vote and they authorized, approved or ratified the transaction; or

3. The transaction was fair to the corporation.

B. For purposes of subdivision A 1, a conflict of interests transaction is authorized, approved, or ratified if it receives the affirmative vote of a majority of the disinterested directors on the board of directors, or on the committee. A transaction shall not be authorized, approved, or ratified under this section by a single director. If a majority of the disinterested directors vote to authorize, approve or ratify the transaction, a quorum is present for the purpose of taking action under this section. The presence of, or a vote cast by, a director who is not disinterested does not affect the validity of any action taken under subdivision A 1 if the transaction is otherwise authorized, approved or ratified as provided in that subsection.

C. For purposes of subdivision A 2, a conflict of interests transaction is authorized, approved, or ratified if it receives the vote of a majority of the votes entitled to be counted under this subsection. The votes controlled by a director

In order for the CSI contract to be approved by the court, CSI must show that the provisions in Va.Code (1950) §13.1-871 are satisfied.

Bankruptcy issues are also involved. Once CSI has shown that there is a valid contract that can be approved by the court, it must show that the contract should be approved. Counsel argued that the contract was made in the ordinary course of the debtor's affairs and that it should be approved under 11 U.S.C. §363(c) as a transaction made in the ordinary course of the debtor's business. There are, however, two conditions that must be satisfied before §363(c) is applicable. First, the debtor must be authorized to transact business. That condition is satisfied. A chapter 11 trustee is authorized to operate the debtor's business under §1108. Under §1107, a debtor in possession has all of the rights of a trustee, "subject to . . . such limitations or conditions as the court prescribes." The second condition is the limitation in §363(c)(1) itself, "unless the court orders otherwise." Under both §363(c) and §1107, the court may place limitations on a debtor in possession and on the business and the manner in which it may conduct its business. This court's June 15, 2012 order restricts CSI from accepting employment from FOA except upon order of this court and removed the proposed transaction from §363(c). This motion is under §363(b).[5]

---

who is not disinterested may not be counted in a vote of members to determine whether to authorize, approve, or ratify a conflict of interests transaction under subdivision A 2. The director's votes, however, may be counted in determining whether the transaction is approved under other sections of this Act. A majority of the members, whether or not present, that are entitled to be counted in a vote on the transaction under this subsection constitutes a quorum for the purpose of taking action under this section.

[5]This is not a transaction that a debtor in possession would ordinarily undertake. It is extraordinary. The counterparty to the contract, FOA, holds a substantial judgment against CSI that CSI cannot satisfy in the ordinary course of its financial affairs. It would appear that FOA could, at any time, refuse to pay CSI accrued fees and set them off against the judgment. This places CSI in a precarious position. It is in constant financial jeopardy. Placing ones head in the open mouth of a lion is not an ordinary action – particularly one with which CSI has had such a contentious history.

**Unresolved Issues**

The evidence presented did not adequately develop the record so that the court could make a reasoned decision on the request to approve the CSI contract. There are a number of questions. Why did FOA file the motion? The court would normally expect the debtor, CSI, to file the motion and FOA to note its consent. Here, FOA filed the motion and CSI noted its consent. In reviewing the record, the court notes that the motion to temporarily employ Mr. Riviere was also made by FOA which noted CSI's consent. FOA is a proper party. It has an interest in the matter. But, CSI is the necessary party. It is the debtor in possession. It is seeking the authority to enter into the contract. It certainly needs FOA's consent – there must be two parties to the contract – but CSI would ordinarily bear the laboring oar and the predominate share of the costs involved. This is a reversal of the expected roles.

Where was CSI's lawyer? CSI is represented by Madeline Trainor. Gordon Properties is represented by Donald F. King. The court does not remember Ms. Trainor speaking at the hearing. In fact, the docket entry for the hearing does not note her presence. (Docket Entry 333.) The court does remember Mr. King speaking in favor of the transaction. The testimony at the hearing was that Ms. Johnson, as counsel for the Special Litigation Committee, negotiated the management contract with Mr. King, not Ms. Trainor. Motion at ¶13.

Why did Philip J. Harvey present the motion instead of John T. Donelan? Mr. Donelan represented the Special Litigation Committee in the negotiation of the comprehensive settlement agreement with Gordon Properties which is now before the court. Mr. Harvey was retained by FOA in the *Sobol* case. He successfully argued FOA's motion to disqualify Reed Smith as counsel for

the *Sobol* plaintiffs.[6] While FOA was the proper party to bring the disqualification motion, the three Gordon Properties-affiliated directors are the principal targets of the suit. The choice of counsel is up to the client, in this case, FOA. At first blush, it would appear that Mr. Donelan would be the natural choice for this assignment. The Special Litigation Committee negotiated the contract with CSI. He represented the Special Litigation Committee in the settlement negotiations. Mr. Harvey did not. Mr. Donelan was knowledgeable in the background of the relationship and the issues. Mr. Harvey had to be brought up to speed on them. It was reasonable to retain Ms. Johnson to negotiate the management contract. That was within her field of expertise and outside Mr. Donelan's and Mr. Harvey's fields of expertise. Counsel explained that Mr. Harvey was participating rather than Mr. Donelan, who was also present, because Mr. Sells did not want Mr. Donelan's attention diverted from the important issue of approval of the settlement.[7] The explanation rings hollow. Mr. Donelan has practiced before this court for many years. He is a well-regarded attorney who would not hesitate to recommended additional counsel for assignments outside his fields of expertise, as he did in recommending that another attorney be retained to negotiate the management contract, as Ms. Johnson was. Nor would he hesitate to decline a case if he did not have the time to attend to it. But, here, the matter was raised by Mr. Sells.

All of these issues, none of which go to the heart of the motion, raise the specter of undue control by the Gordon Properties-affiliated directors. They could suggest that costs are being shifted from CSI or Gordon Properties to FOA. They could suggest that the selection of counsel is being manipulated to prevent the strongest cases against the positions advocated by CSI and Gordon

---

[6]Reed Smith had represented FOA for more than six years in the litigation with CSI and Gordon Properties. *See Sobol v. Sells (In re Gordon Properties, LLC),* 2013 WL 681430 (Bankr.E.D.Va. Feb. 25, 2013).

[7]The Rule 9019 settlement motion was also on the court's docket that day for a status and scheduling hearing.

Properties from being fully developed. It could suggest that Mr. Sells thinks that Mr. Donelan is "too independent." They could suggest nothing of the kind. They are procedural matters, not matters that go to the substance of the motion.

These are not the only procedural matters that merit attention. Another is the process by which CSI was selected. Mr. Reviere prepared the RFP in the first instance. He reports to the owner of CSI – Gordon Properties which is owned by two of the four Gordon Properties-affiliated directors of FOA. It appears that all responses to the RFP were returned to CSI, a competitor of the prospective bidders, not to the FOA board of directors. There was inadequate response to the RFP. There was no indication of any follow-up to encourage responses. There was no credible explanation why the RFP for this significant management contract was basically ignored in the industry. Nonetheless, the board with its three Gordon Properties-affiliated directors awarded the contract to CSI by a 5 to 2 vote. Motion at ¶9. The Special Litigation Committee was responsible for negotiating the specific terms of the contract, but had no voice in the selection of the managing agent or the process for obtaining bids. The critical decision was the selection of the managing agent, not the negotiation of the specific terms of the management contract. The procedural process that FOA followed, delegating an important but not critical matter to the Special Litigation Committee while reserving the critical matter to the board, raises issues that must be addressed.

The final contract was brought before the board for final approval and approved by a vote of 4 to 3. Motion at ¶14. This was a reversal from the initial vote of 6 to 0 with the seventh director absent.[8] There was no explanation for this reversal. Mr. King suggested that the sole original

---

[8] The Consent Motion stated that the vote was 3 to 0 with three abstentions. Consent Motion at ¶12. This is similar to the trial evidence that the first vote was 6 to 0. The Consent Motion identifies the three who voted in favor of the motion. None were affiliated with Gordon Properties. The three abstentions were the three Gordon Properties-affiliated directors. The final vote was 4 to 3 with the four consisting of the three Gordon Properties-affiliated directors

dissentient was implacably opposed to Gordon Properties and would automatically vote against anything favoring Gordon Properties. There was no evidence to support this. The addition of two votes against the management contract on the final vote suggests that the original negative vote was not unreasonable or without a legitimate basis. In issues raised by the Va.Code (1950) §13.1-871, the court needs to understand both the arguments for and against the transaction. The arguments against the transaction cannot be simply marginalized and dismissed.

The court also notes that there was no evidence of the disclosures made by the Gordon Properties-affiliated directors. While the adversarial positions are generally known, the details of the effect of the management contract on CSI's operations or its bankruptcy were not discussed. A simple review of the monthly operating reports raises questions rather than answers them.

While these are some of the issues that must be addressed to resolve the conflict of interest issue, CSI's bankruptcy issues must also be addressed. CSI has not proposed a plan of reorganization. Without a proposed plan and financial projections, it is difficult to evaluate the effect of the proposed contract on CSI. It is difficult to evaluate whether CSI is capable of performing the contract. There is a question of the staffing that would be required and whether CSI has the financial wherewithal to achieve and support it. Gordon Properties has not proposed a plan of reorganization. With the extraordinary administrative expenses of the case, it is not clear the extent which it can and will continue to support CSI if CSI needs additional support. If the contract is approved and CSI fails to fully perform, damages arising from its breach could be administrative expenses to the detriment of all other creditors.

The most salient issue, though, is the prospective working relationship between CSI and

---

and one of the original three non-affiliated directors who originally voted in favor of the contract.

FOA. If the past is prologue, it is dismal and CSI should be hesitant to enter into a business venture with FOA. A partial answer lies in the settlement between Gordon Properties, CSI and FOA. It is before the court on the Rule 9019 motion for approval. In many respects, that motion needs to be resolved before this motion. The resolution of the claims among the parties would clear the way for a better understanding of the prospective working relationship between CSI and FOA, whether they will be able to work constructively together or whether there will be continued resentment and hostility. This goes to the likely success of the business venture and is a factor that the court should consider under §363(b).

## **Conclusion**

The hearing on the approval of the CSI management contract did not develop all of the issues that the court must consider. A further hearing will be scheduled to further consider the motion so that a fuller record can be developed.

Alexandria, Virginia
April 15, 2013

/s/ Robert G. Mayer
Robert G. Mayer
United States Bankruptcy Judge

Copy electronically to:

Donald F. King
Philip J. Harvey
Joseph A. Guzinski

18436